# U.S. COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 22-1587

COMMONWEALTH OF PENNSYLVANIA,
PENNSYLVANIA GAME COMMISSION,
Appellant

v.

THOMAS E. PROCTOR HEIRS TRUST,
under Declaration of Trust dated October 28, 1980,
which is recorded in Sullivan County in Book 1106,
at page 879, its successors and assigns

_____

Appeal from the U.S. District Court, M.D. Pa.
Judge Christopher C. Conner, No. 1:12-cv-01567

Before: KRAUSE, PHIPPS, and ROTH, *Circuit Judges*
Submitted Sep. 22, 2025; Decided Jul. 31, 2026

_____

OPINION OF THE COURT

KRAUSE, *Circuit Judge*.[1]  In *Galette v. New Jersey Transit Corp.*, 607 U.S. 509 (2026), the Supreme Court clarified the proper framework for determining whether a state-created entity is an "arm of the state"—a status that carries significant consequences for federal jurisdiction.  One, at issue in *Galette*, is that the entity then qualifies for sovereign immunity, but another is that the entity is disqualified from state "citizenship" for purposes of diversity jurisdiction.  This appeal arises in the latter context and requires us, for the first time, to consider how *Galette* affects the framework we have historically applied and, in so doing, we answer the question percolating in our district courts as to whether Appellant, the Pennsylvania Game Commission, is an "arm" or a citizen of the Commonwealth of Pennsylvania.

Because we conclude, under an updated arm-of-the-state analysis, that the Game Commission is a citizen, the Game Commission properly invoked diversity jurisdiction and we must reach the merits of this quiet title action.  From that point, the merits are resolved by the Pennsylvania Supreme Court's answer to our certification petition on a controlling question of state law:  The Thomas E. Proctor Heirs Trust retains an ownership interest in the subsurface estate of the tract of land

---

[1] This matter was originally heard on January 11, 2023, before Judges Jordan, Phipps, and Roth, who certified a question of state law to the Pennsylvania Supreme Court pursuant to 3d Cir. L.A.R. Misc. 110.  While that matter was pending, Judge Kent A. Jordan retired, and the panel was reconstituted to include Judge Cheryl Ann Krause.

at issue, so we will affirm the District Court's judgment in favor of the Trust.

## I.     BACKGROUND

This appeal concerns the ownership rights to a single tract of land, the Josiah Haines warrant, presenting "bellwether" claims as to District Court litigation involving thousands of acres of land with valuable oil and gas deposits in northeastern Pennsylvania. *Pa. Game Comm'n v. Thomas E. Proctor Heirs Tr.*, No. 1:12-cv-1567, 2021 WL 5759030, at *1 (M.D. Pa. Dec. 3, 2021). Bradford County sold the Josiah Haines warrant at a public tax sale in 1908, and we are tasked with determining the effect of that sale.

Title to the Josiah Haines warrant and its subsurface resources passed through several hands before the 1908 tax sale. In 1894, one year after Thomas E. Proctor, the Trust's predecessor, obtained title to the Josiah Haines warrant, Proctor, Jonathan A. Hill, and their wives conveyed its surface estate to the Union Tanning Company, while reserving the subsurface estate—i.e., "all the minerals, coal, oil, gas, or petroleum"—to themselves and their heirs.[2] App. 313; 360-74.

---

[2] Bradford County classified the Josiah Haines warrant as "unseated land." App. 169, 561. Prior to 1947, Pennsylvania distinguished between seated land—which contained residential structures or valuable personal property, or produced a regular profit through cultivation, lumbering, or mining—and unseated land—which was any "wild" land that

3

The Union Tanning Company paid taxes on the surface estate until 1903, when it conveyed the Josiah Haines warrant, subject to all prior exceptions and reservations, to its affiliate, the Central Pennsylvania Lumber Company (CPLC).

The controversy underlying this appeal arose when CPLC failed to pay taxes on the surface estate in 1907 and, because of that tax default, Bradford County sold the Josiah Haines warrant at a public tax sale in 1908. The purchaser at the tax sale was Calvin H. McCauley, Jr., who had close ties to the defaulting party; he had served as CPLC's treasurer, real estate agent, and assistant general solicitor since its inception in 1903. Although McCauley nominally owned the Josiah Haines warrant, CPLC continued to pay taxes on the surface estate in the following years. And in 1910, McCauley and his wife quitclaimed the land back to CPLC for just $1.00.

Ten years later, CPLC conveyed various tracts of land, including the Josiah Haines warrant, to the Pennsylvania Game Commission subject to the Trust's prior reservations of its subsurface rights in the 1894 and 1903 deeds. The Game Commission and the Trust now seek to quiet title and obtain a

---

did not qualify as seated. *Pa. Game Comm'n v. Thomas E. Proctor Heirs Tr.*, 335 A.3d 1108, 1110 (Pa. 2025) (quoting *Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 364 (Pa. 2016)). Both seated and unseated land "could be severed into surface and subsurface estates, which could be separately assessed, taxed, and, if necessary, sold at tax sale." *Id.* at 1111 n.3 (quoting *Keller*, 143 A.3d at 364).

4

declaration that they are the respective owners of the oil, gas, and mineral rights associated with the subsurface estate of the Josiah Haines warrant.

The Game Commission invoked the District Court's diversity jurisdiction to resolve this state-law question of property ownership in federal court.[3] Following discovery and multiple motions for summary judgment, the District Court ordered the parties to proceed to trial, noting that material disputes of fact existed as to whether Bradford County assessed the Josiah Haines warrant as seated or unseated land in 1907 and whether McCauley was acting as CPLC's agent when he purchased the warrant at the 1908 tax sale.

Those factual disputes were resolved through a one-day bench trial where the District Court reviewed over one hundred exhibits and subsequently entered judgment in favor of the Trust. It determined that "CPLC had an affirmative duty to pay taxes assessed on its interest in the surface estate, and breached its duty by failing to pay those taxes in 1907," and that "McCauley was acting as CPLC's agent at the 1908 tax sale," so under Pennsylvania law, CPLC could not use its agent to acquire a better title at the tax sale. *Pa. Game Comm'n*, 2021 WL 5759030, at *18. Therefore, "McCauley's purchase acted

---

[3] The parties' quiet title claims involve the Josiah Haines warrant and various nearby tracts of land, but this appeal focuses on the former. We do not opine on the parties' quiet title claims as to any other tracts of land.

as a redemption" of CPLC's surface interest, leaving the Trust's subsurface interest untouched. *Id.*

At the Game Commission's request and pursuant to 28 U.S.C. § 1292(b), the District Court certified a portion of its post-trial judgment order for interlocutory appeal, specifying the single question of controlling law that is now before us for review:

> Under Pennsylvania law in effect at all times relevant to the instant quiet title dispute, did the owner of an unseated surface estate have a legal duty to pay taxes assessed on said surface estate, thereby preventing the owner—or the owner's agent—from acquiring better title to the land at a tax sale induced by the unseated surface owner's default?

App. 3. Meanwhile, the Commonwealth Court of Pennsylvania was considering a case involving the same parties and raising similar issues, so after hearing oral argument, we initially held this appeal *c.a.v.* to allow the Pennsylvania courts to resolve the issues of state law in the first instance. But because the state court case was at a substantially earlier stage of litigation and the Commonwealth Court had stayed its proceedings pending our resolution of the Game Commission's request to certify the controlling legal question to the Pennsylvania Supreme Court, we vacated our hold and

6

granted that certification request.[4] The Pennsylvania Supreme Court accepted the certification and, in a thorough and carefully crafted opinion, held that Pennsylvania's title wash doctrine did not apply to the 1908 tax sale. *See Pa. Game Comm'n v. Thomas E. Proctor Heirs Tr.*, 335 A.3d 1108, 1110 (Pa. 2025). That is, it "determine[d] that the 1908 tax sale did not constitute a title wash but, rather, acted as a mere redemption of taxes owed and, as such, did not divest the subsurface owners of their interest in the [Josiah] Haines Warrant." *Id.*

As we were poised to finally decide the issue, we identified an open question regarding the propriety of diversity jurisdiction and obtained supplemental briefing. At that point, the Game Commission, which had alleged in its complaint that it has Pennsylvania citizenship as "an independent state commission of the Commonwealth of Pennsylvania," App. 83, changed its mind after receiving the Pennsylvania Supreme

---

[4] We modified the certified question to the Pennsylvania Supreme Court as follows:

> [W]hether, on the record provided here, a 1908 tax sale of an unseated parcel of land, induced by the surface owner's failure to pay taxes on the estate, and made to an agent of the defaulting surface owner, constitutes a title wash, thereby divesting the subsurface owner of his interest in the estate.

*Pa. Game Comm'n v. Thomas E. Proctor Heirs Tr.*, No. 22-1587, 2023 WL 8224102, at *1 (3d Cir. Oct. 11, 2023).

Court's adverse opinion concerning the title wash doctrine and asserted that it is an arm, not a citizen, of the Commonwealth. The Trust, of course, maintained that the Game Commission is a citizen and that the Pennsylvania Supreme Court's decision controls. We now proceed to address both our jurisdiction and the answer to the controlling question of Pennsylvania law, ultimately concluding that the Game Commission's Hail Mary argument cannot win the day.

## II.   JURISDICTION AND STANDARD OF REVIEW

Having concluded that the Trust and the Game Commission are citizens of different states and the amount-in-controversy requirement is satisfied, the District Court properly exercised jurisdiction under 28 U.S.C. § 1332, and we accept jurisdiction pursuant to 28 U.S.C. § 1292(b).[5]   We exercise plenary review over issues of subject matter jurisdiction, reviewing legal

---

[5] In this interlocutory appeal, "we may address any issue fairly included within the [District Court's] certified order because it is the order that is appealable, and not the controlling question identified by the district court." *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs. Inc.*, 12 F.4th 337, 344 (3d Cir. 2021) (citation modified).  Here, the certified order encompasses only "Part IV.C of the memorandum and order" of the District Court "dated December 3, 2021."  App. 3.  Therefore, although our review is not limited to the controlling question of law articulated by the District Court, we "may not reach beyond the certified order" to consider the District Court's factual findings or "other orders made in the case."  *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996).

8

conclusions de novo and factual findings for clear error. *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 345 (3d Cir. 2013). The Pennsylvania Supreme Court's opinion on the certified question of state property law "constitutes precedent that we are bound to follow." *Wirth v. Aetna U.S. Healthcare*, 469 F.3d 305, 311 (3d Cir. 2006).

## III. DISCUSSION

Before addressing the merits of the District Court's certified question, we must confirm that the Game Commission properly invoked the District Court's subject matter jurisdiction. The Game Commission's complaint asserts that the District Court had jurisdiction based on the diversity of the parties under 28 U.S.C. § 1332, which extends federal courts' limited subject matter jurisdiction to civil disputes between "citizens of different States." *Id.* § 1332(a)(1). But we have a "continuing obligation to assess subject matter jurisdiction *sua sponte* at all stages of the proceeding, even when parties do not raise the issue," *Peace Church Risk Retention Grp. v. Johnson Controls Fire Prot. LP*, 49 F.4th 866, 869 (3d Cir. 2022), and the citizenship status of the Game Commission is reasonably in question. We therefore consider the question of jurisdiction before turning to the merits.

### A. Subject Matter Jurisdiction

Before *Galette v. New Jersey Transit Corp.*, 607 U.S. 509 (2026), we had developed a rather elaborate arm-of-the-state test using the so-called *Fitchik* factors, *see Fitchik v. N.J.*

9

*Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989) (en banc), and several subfactors we articulated over time, *see Maliandi v. Montclair State Univ.*, 845 F.3d 77, 83-84 (3d Cir. 2016), to structure our analysis, *see, e.g.*, *Patterson v. Pa. Liquor Control Bd.*, 915 F.3d 945, 951-55 (3d Cir. 2019) (outlining and applying the multifactor test). Given the variation among the Courts of Appeals and state supreme courts, however, the Supreme Court took up the issue and has now provided valuable guidance. We will briefly review the lessons of *Galette* and then apply them to the Game Commission.

### 1. Guidance from the Supreme Court in Galette

In *Galette*, the Supreme Court resolved a disagreement between two state supreme courts as to whether the New Jersey Transit Corporation (NJ Transit) is an arm of New Jersey. It first explored the features of NJ Transit, noting that New Jersey "structured the entity as a body corporate and politic with corporate succession," located within the Department of Transportation but "independent of any supervision or control by the department." *Galette*, 607 U.S. at 516 (citation modified). New Jersey also gave NJ Transit "significant authority," including, among others, the powers to "sue and be sued; enter into contracts; acquire or deal in and with real or personal property; raise funds . . . ; adopt rules and regulations as necessary; and exercise eminent domain powers." *Id.* (citing N.J. Stat. §§ 27:25-5, 27:25-13). But New Jersey tempered that authority by empowering its Governor to veto any action

10

taken by NJ Transit's board of directors, and the state expressly disclaimed any liability for NJ Transit's debts or liabilities in the entity's organic statute. *See id.* at 516-17 (citing N.J. Stat. §§ 27:25-4(f), 27:25-17).

The Court then chronicled its arm-of-the-state precedents and discerned that those cases "have consistently, and predominantly, examined whether the State structured the entity as a legally separate entity liable for its own judgments." *Id.* at 523-24. While those precedents "also suggest[ed] that courts may consider the degree of control the State exerts over the entity," the Court warned that we "should do so with caution" because "ultimate control of every state-created entity resides with the State" and "gauging actual control" based on various factors "can be a perilous inquiry." *Id.* at 526 (citation modified). It applied those considerations to NJ Transit, emphasizing the entity's corporate structure and "typical corporate powers," as well as New Jersey's lack of formal liability for the entity's debts or liabilities. *Id.* at 529. And based on those two primary considerations—legal separation and source of liability funding—the Court determined that NJ Transit "is a legally separate corporation and is responsible for its own judgments," and observed that New Jersey's "substantial amount of control over NJ Transit," did not "meaningfully affect" the conclusion that it is not an arm of the state. *Id.* at 530.

Prior to *Galette*, our arm-of-the-state test centered on the three factors we adopted in *Fitchik v. N.J. Transit Rail*

11

*Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989) (en banc); namely, "(1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has." *Patterson*, 915 F.3d at 950 (quoting *Karns v. Shanahan*, 879 F.3d 504, 513 (3d Cir. 2018)). We previously treated these three factors as "co-equal," *id.* (citation modified), but the Supreme Court's analysis in *Galette* has since modified our approach by placing nearly all the weight on the first two factors and treating the autonomy factor as a distant third of limited relevance, *see* 607 U.S. at 523-25.

While *Galette* altered the weight assigned to the three *Fitchik* factors, the substance of those factors remains largely intact. The "predominant[]" considerations identified in *Galette* map onto our first two *Fitchik* factors: Whether an entity is "liable for its own judgments" is covered by the funding factor, and whether an entity is "legally separate" is addressed by the status-under-state-law factor. *Id.* at 523-24. And it is apparent from the Court's analysis of NJ Transit that, when it comes to identifying whether an entity "is a legally separate corporation . . . responsible for its own judgments," *id.* at 530, the same subfactors we have historically looked at remain pertinent, *see Maliandi*, 845 F.3d at 86, 91.

Going forward, then, to determine whether an entity is an arm of the state, our analysis will predominantly focus on (1) whether the entity is "liable for its own judgments," and (2) whether the state "structured the entity as a legally separate

12

entity." *Galette*, 607 U.S. at 524. We may consider "with caution" the degree of control exercised by the state over the entity, but we will assign that consideration low probative value and bear in mind that the Supreme Court "has never once found a corporation that was liable for its own judgments to be an arm of the State, even when the State had significant control over the entity." *Id.* at 526. The *Fitchik* factors and their various subfactors will continue to guide our arm-of-the-state analysis, and our precedents assessing those factors remain authoritative. But at the balancing stage, consistent with *Galette*, we will no longer treat the entity's degree of autonomy as co-equal with the predominant considerations.

2. *Application of the Updated Arm-of-the-State Test to the Game Commission*

It is well established that "a State is not a 'citizen' for purposes of . . . diversity jurisdiction," nor are its constituent entities that are "simply 'the arm or *alter ego* of the State.'" *Moor v. County of Alameda*, 411 U.S. 693, 717 (1973) (emphasis added) (citing *Postal Tel. Cable Co. v. Alabama*, 155 U.S. 482, 487 (1894)). The test to determine whether an entity is an arm of the state for diversity purposes "parallels" our Eleventh Amendment sovereign-immunity analysis, *Blake v. Kline*, 612 F.2d 718, 726 (3d Cir. 1979); *see also Galette*, 607 U.S. at 521 (citing *Moor*, 411 U.S. at 717-19)).[6] So, we

_____

[6] Unlike sovereign immunity, however, the diversity of citizenship required for federal courts to exercise subject

13

will apply our updated arm-of-the-state test, as refined by the Supreme Court's guidance in *Galette*, to determine whether the Game Commission is an arm of Pennsylvania—i.e., whether it is structured as "a legally separate entity liable for its own judgments."[7] 607 U.S. at 524.

   a. *Galette*'s First Predominant Consideration: Liability for Judgments Against the Entity

The first predominant consideration addresses "whether the entity is liable for its own judgments"—specifically, whether "any judgment against the entity must be satisfied out of the state treasury." *Id.* at 525 (citation modified). As discussed below, we look to "(1) a state's legal obligation to pay a money judgment entered against the entity; (2) whether the agency has money to satisfy the judgment; and (3) whether there are specific statutory provisions that immunize the state from

---

matter jurisdiction "can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002).

[7] Our inquiry is informed by reference to the characteristics of analogous Pennsylvania entities that have been the subjects of similar arm-of-the-state analyses. *See, e.g.*, *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140, 1150 (3d Cir. 1995) (holding that the Turnpike Commission is not an arm of the state); *Gerr v. Emrick*, 283 F.2d 293, 297-98 (3d Cir. 1960) (same); *Pa. Hum. Rels. Comm'n v. USAir, Inc.*, 615 F. Supp. 75, 78 (W.D. Pa. 1985) (holding that the Pennsylvania Human Relations Commission (PHRC) is an arm of the state).

14

liability for money judgments." *Patterson*, 915 F.3d at 951 (citing *Fitchik*, 873 F.2d at 659).

    *i.*    *The Commonwealth's Legal Obligation to Pay a Money Judgment Against the Game Commission*

We focus our analysis of the Commonwealth's obligation to bear judgments against an entity on its "*formal* legal liability." *Galette*, 607 U.S. at 525 (emphasis added). If it were apparent from the face of Pennsylvania's statutory provisions that the Commonwealth "is formally liable for judgments against" the Game Commission, such that the Game Commission's liabilities would "necessarily undermine the State's ability to make choices about how to allocate the State fisc," the Game Commission would be "more likely to be an arm of the State." *Id.* Here, unlike in *Galette*, the relevant statutory provisions do not expressly impose or disclaim such obligations. *Compare* 607 U.S. at 529-30 ("New Jersey law provides that '[n]o debt or liability of the corporation shall be deemed or construed to create or constitute a debt, liability, or a loan or pledge of the credit of the State.'" (quoting N.J. Stat. § 27:25-17)), *with* 34 Pa. Cons. Stat. § 301 *et seq.* (lacking any similar language). Therefore, we must look beyond the Commonwealth's formal assumption of liabilities and consider "the practical realities of state funding." *Galette*, 607 U.S. at 534.

The Supreme Court cautioned against "[h]inging an entity's arm-of-the-State status to [such] practical realities," in part, because NJ Transit's state funding oscillated from year to year,

15

risking "arbitrary distinctions." *Id.* In contrast, this is not a situation where we must "decide how much [state] funding is enough" to prove financial entanglement with the state, *id.*, because the Game Commission "receives no General Fund money from the state's annual budget," *Frequently Asked Questions*, Pa. Game Comm'n, https://www.pa.gov/agencies/pgc/about-us/frequently-asked-questions [https://perma.cc/4224-NQK2] (last visited Apr. 30, 2026); *see also Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017).

Rather than relying on appropriations from the General Fund, the Game Commission has the exclusive right to expend money from a "separate fund," known as the Game Fund, "for any contingent, incidental or other expenses of any kind or description reasonably necessary in carrying on the work of the commission." 34 Pa. Cons. Stat. § 521(a); *see id.* § 522. Money in the Game Fund primarily consists of revenues from hunting and furtaking licenses, *see* 34 Pa. Cons. Stat. § 2709, proceeds from the sale of mineral leases and similar grants to use its lands, *see id.* §§ 725, 727, and federal wildlife restoration funds, *see id.* § 324. The fact that independently generated money in the Game Fund is intended to cover the Game Commission's expenses suggests that "[Pennsylvania] is under no obligation to pay [the Game Commission's] debts or reimburse [the Game Commission] for judgments that it pays," and any state appropriation to the Game Commission because of an adverse judgment "will be entirely the result of discretionary action by the state." *Fitchik*, 873 F.2d at 661

16

(citation modified); *cf. Galette*, 607 U.S. at 525 ("In contrast to formal legal liability, an entity's . . . expectation that the State would cover its judgments if needed, has less relevance.").

We confronted a similar situation in *Christy v. Pennsylvania Turnpike Commission*, 54 F.3d 1140 (3d Cir. 1995), where the Turnpike Commission's organic statute likewise lacked express language about the Commonwealth's legal obligation to pay its judgments. There, we remarked: "That four of the five established sources of the Commission's funding are not state-derived is, we think, even in the absence of additional information, some support for the conclusion that the Commission is not the alter ego of Pennsylvania." *Christy*, 54 F.3d at 1145. That support is even stronger here, where none of the Game Commission's funding derives from the General Fund.

Although the Game Commission is subject to performance audits and must submit annual estimates of its expenditures to the Governor for approval, *see* 34 Pa. Cons. Stat. § 522, that sort of "state regulation of the Commission's funding" is "only significant to the funding analysis where such control indicates state ownership of the funds," *Christy*, 54 F.3d at 1145-46; *see also Galette*, 607 U.S. at 526 (noting that "[c]ontrol is not especially probative"). And because the Commonwealth's oversight of the Game Commission's expenditures from the Game Fund—which "shall be used solely" by the Game Commission, 34 Pa. Cons. Stat. § 521(a); *see id.* § 522(a)— does not show "a financial interest on the part of Pennsylvania

17

that would be directly and adversely affected by the diminution of the Commission's funds," that oversight "falls short of indicating state ownership of the funds," *Christy*, 54 F.3d at 1146.[8]

    ii.    *The Game Commission's Ability to Satisfy a Judgment Against It*

Next, we consider "whether the entity has money to pay an adverse judgment, and whether the entity has sources of funding aside from state appropriations that could satisfy the judgment." *Patterson*, 915 F.3d at 951-52 (citation modified). Although this subfactor does not address "whether the State would be formally obligated to pay the entity's judgments," *Galette*, 607 U.S. at 534, it informs our determination of whether an entity will bear its own judgments where, as here, its organic statute is silent as to formal liability.

As discussed above, "all moneys in the Game Fund are . . . appropriated to the [Game Commission]," 34 Pa. Cons. Stat. § 522(a), and those funds are substantial, *see*

---

[8] *See also Galette v. New Jersey Transit Corp.*, 607 U.S. 509, 530 (2026) (determining that the State's "substantial amount of control over" the entity—including gubernatorial veto authority—"does not change the overall conclusion" that the entity is not an arm of the state); *Fitchik*, 873 F.2d at 660 (explaining that the Governor's ability to influence the entity's revenue-raising efforts by exercising veto power over its operations did not indicate state ownership of the entity's money).

Pennsylvania Office of the Budget, *2025-26 Governor's Executive Budget* (2025), at E21-2; *cf. Vanderklok*, 868 F.3d at 205 n.16. The Game Commission also "need not 'request funds from the state coffers in order to meet shortfalls caused by adverse judgments,'" *Bolden v. Se. Pa. Transp. Auth.*, 953 F.2d 807, 819 (3d Cir. 1991) (en banc) (quoting *Fitchik*, 873 F.2d at 661), because it can cover any shortfall by raising certain fees or by decreasing its expenses, 34 Pa. Cons. Stat. §§ 725, 2904(c).

These facts suffice to show that the Game Commission could independently pay a judgment against it. *See Christy*, 54 F.3d at 1146-47 (noting that the Turnpike Commission's ability to increase revenue through toll rates or decrease expenses demonstrated its ability to satisfy a judgment against it).[9]

### iii. The Commonwealth's Immunization from the Game Commission's Debts and Liabilities

When analyzing the final funding subfactor, we ask "whether the state has immunized itself from the entity's debts." *Patterson*, 915 F.3d at 952; *see Galette*, 607 U.S.

---

[9] *See also Cooper v. Se. Pa. Transp. Auth.*, 548 F.3d 296, 305 (3d Cir. 2008) (observing that a transportation agency could raise fares to satisfy a judgment); *Fitchik*, 873 F.2d at 661 (same); *cf. USAir*, 615 F. Supp. at 77 ("The PHRC is entirely dependent on Commonwealth for its funding because the PHRA makes no provision for the collection of fines.").

at 530 (highlighting that, under New Jersey law, "[n]o debt or liability of [NJ Transit] shall be deemed or construed to create or constitute a debt . . . of the State" (quoting N.J. Stat. § 27:25-17)). The Game Code provides that "any contingent, incidental or other expenses of any kind or description reasonably necessary in carrying on the work of the [Game Commission]" should be paid from the Game Fund. 34 Pa. Cons. Stat. § 521. Although there is no statutory provision, as there was in *Galette*, *see* 607 U.S. at 529-30, expressly immunizing the Commonwealth from responsibility for the Game Commission's debts and liabilities, we have previously rejected the argument "that the absence of a blanket disclaimer is significant," *Christy*, 54 F.3d at 1147. So, in the absence of such an express disclaimer of liability or an indication that the Commonwealth is under any affirmative obligation to pay for judgments against the Game Commission, *see* Section II.A.2.a.i, this subfactor carries little weight.

\* \* \*

In sum, because the Game Commission is "responsible for its own judgments," with payment coming from the Game Fund rather than the state treasury, the first predominant consideration indicates that the Game Commission is not an arm of the state. *Galette*, 607 U.S. at 530.

20

## b. *Galette*'s Second Predominant Consideration: Separate Legal Status of the Entity

The second predominant consideration requires us to determine whether Pennsylvania structured the Game Commission "as part of itself or as legally independent." *Galette*, 607 U.S. at 525; *see Fitchik*, 873 F.2d at 662. Four subfactors guide our analysis: "(1) how the law treats the agency generally; (2) whether the agency is separately incorporated; (3) whether the agency can sue and be sued in its own right; (4) and whether it is immune from state taxation." *Patterson*, 915 F.3d at 953; *see also Galette*, 607 U.S. at 528-30 (considering several of these subfactors).

### i. *Overall Treatment Under Pennsylvania Law*

First, we look to Pennsylvania's statutes and opinions from its state courts to assess the Game Commission's general treatment under state law. Pennsylvania statutes define the Game Commission as an "independent administrative commission," 34 Pa. Cons. Stat. § 301(a), or an "independent agency," 71 P.S. § 732-102, that is "not subject to the policy supervision and control of the Governor," 2 Pa. Cons. Stat. § 101. The Game Commission possesses "the hallmarks of separate legal personhood," *Galette*, 607 U.S. at 530, including the powers to sue in its own name, 34 Pa. Cons. Stat. § 322(a); enter contracts, 34 Pa. Cons. Stat. §§ 302(f), 323; acquire property for its own use, albeit not in its own name, 34 Pa. Cons. Stat. §§ 701, 706; collect licensing fees, 34 Pa. Cons. Stat. § 2709; and raise proceeds from the sale of rights and

21

natural resources under its purview, 34 Pa. Cons. Stat. § 727; *see also Galette*, 607 U.S. at 529 (citing NJ Transit's power to sue and be sued, make contracts, acquire property, set and collect fares, and raise funds as evidence of its legal separateness); *Christy*, 54 F.3d at 1148 (noting that the powers to sue and enter contracts are "traits not at all characteristic of an arm of the state").

No doubt, some statutory provisions give inconsistent signals about the Game Commission's status by granting it attributes of sovereignty. For example, the Game Commission may exercise eminent domain when acquiring property, employ personnel to exercise law enforcement powers, and enact regulations to ensure proper use of its lands. *See* 34 Pa. Cons. Stat. §§ 303(a), 322(c)(10), 701, 901. But the Supreme Court explained that a state's decision to delegate to an entity "substantial plenary public powers, such as the power to operate a police force, exercise eminent domain power, and promulgate regulations," is not the concern of the arm-of-the-state test. *Galette*, 607 U.S. at 532 (citation modified). We focus "not on whether the entity serves public functions, but rather on whether the State has chosen to serve those public functions through its own apparatus or through that of a legally separate entity." *Id.* And we have already recognized that such attributes of sovereignty are not particularly salient, as they were also true of the Turnpike Commission, *see Christy*, 54 F.3d at 1148; 74 Pa. Cons. Stat. § 8107, where we still concluded "[o]n balance" that the second predominant consideration "weigh[ed] slightly in favor

of the conclusion that the [Turnpike] Commission is *not* an arm of the Commonwealth of Pennsylvania," *Christy*, 54 F.3d at 1148.

While Pennsylvania's statutory provisions favor the conclusion that the Game Commission is not structured as an arm of the state, we are cognizant that several Pennsylvania state courts, including its Supreme Court, have concluded that the Game Commission is entitled to sovereign immunity. *See, e.g.*, *Bannard v. N.Y. State Nat. Gas Corp.*, 172 A.2d 306, 313 (Pa. 1961); *Roe v. Pa. Game Comm'n*, 147 A.3d 1244, 1252 (Pa. Commw. Ct. 2016); *Holland v. Pa. Game Comm'n*, No. 4 M.D. 2011, 2011 WL 10819503, at *2 (Pa. Commw. Ct. Sept. 14, 2011).

Nevertheless, the United States Supreme Court has relied heavily on whether the State imbued the entity "with the traditional corporate powers to sue and be sued, hold property, make contracts, and incur debt," *Galette*, 607 U.S. at 524, and here, the Game Commission "has all the hallmarks of separate legal personhood, . . . which all indicate that it is not an arm of the State," *id.* at 530. We therefore conclude that this subfactor weighs in favor of concluding that the Game Commission is not an arm of the state.

ii. *Separate Corporate Existence*

The Supreme Court has emphasized that an entity's corporate form, though "not dispositive," *Galette*, 607 U.S. at 530, is "particularly salient" evidence that a state created it

23

as a legally separate entity, *id.* at 524. Indeed, the Court suggested that, when a state chooses to establish an entity as a corporation, we "should presume that the corporation . . . is no longer part of the State itself." *Id.* at 524-25. But we acknowledge an entity as separately incorporated only "when there is statutory language explicitly stating the same," *Patterson*, 915 F.3d at 953, and there is no explicit statutory provision stating that the Game Commission is separately incorporated. Thus, this subfactor favors a determination that the Game Commission is an arm of the state.

### iii. *Ability to Sue and Be Sued*

An entity is less likely to be an arm of the state if it can sue and be sued in its own name. *See Maliandi*, 835 F.3d at 94; *see also Galette*, 607 U.S. at 529-31 (discussing the import of NJ Transit's sue-and-be-sued authority). The Game Code provides that the Game Commission has explicit authority "to enforce, by proper actions and proceedings, the laws of this Commonwealth relating thereto." 34 Pa. Cons. Stat. § 322(a). Like the Turnpike Commission, the Game Commission has an unrestricted power to sue and be sued that is "not at all characteristic of an arm of the state." *Christy*, 54 F.3d at 1148; *see* 74 Pa. Cons. Stat. § 8107(a)(3).[10]

---

[10] *Cf. USAir*, 615 F. Supp. at 77 (holding that the PHRC is an arm of the state, in part because its "power to sue is limited to filing 'petitions in court' to secure enforcement of its orders" (quoting 43 Pa. C.S. § 960)).

24

True, the Game Commission is subject to the Commonwealth Attorneys Act, *see* 71 P.S. § 732-101 *et seq.*, which requires the Attorney General to represent independent agencies, including the Game Commission, unless "it is more efficient or otherwise is in the best interest of the Commonwealth" to "authorize the General Counsel or the counsel for an independent agency to initiate, conduct or defend any particular litigation or category of litigation in his stead," 71 P.S. § 732-204(c). Yet the option to be represented by the Attorney General is not dispositive of this subfactor because the Game Commission may request authorization for its agency counsel to represent the entity instead and, if such a request is denied, to intervene as a matter of right on behalf of the Game Commission. *Id.* § 732-403. Because the Turnpike Commission is likewise subject to the Act but is not considered an arm of Pennsylvania, *id.* § 732-102; *see Christy*, 54 F.3d at 1150, this subfactor counsels that the Game Commission is not either.

### iv.     *Immunity from State Taxation*

We have also held that an entity's immunity from state taxation weighs in favor of determining that it is an arm of the state. *See Maliandi*, 845 F.3d at 95; *Christy*, 54 F.3d at 1148. But an explicit statutory provision exempting the entity from taxation points in the other direction because, "[h]ad the state legislature regarded the [entity] as the Commonwealth itself[,] it would have been utterly superfluous to give an express tax exemption." *Darby v. L. G. De Felice & Son, Inc.*, 94 F. Supp.

25

535, 537 (E.D. Pa. 1950) (recognizing that the Turnpike Commission's statutory tax exemption was a "very important" attribute supporting diversity jurisdiction). While the Supreme Court did not address NJ Transit's tax status in *Galette*, the Court noted that its "discussion [was] not intended to exhaust all considerations that may be relevant to the arm-of-the-State analysis, and instead focuse[d] on the considerations most pertinent" to that entity. 607 U.S. at 527 n.5. So at least where, as here, the entity is not separately incorporated and we cannot "presume" that it "is no longer part of the State itself," we will continue to analyze this subfactor. *Id.* at 524-25.

Here, the Game Commission is not immune from state taxes in the traditional sense, as the Game Code expressly requires it to "make payments in lieu of taxes" on its property. 34 Pa. Cons. Stat. § 708. Although these payments in lieu of taxes might impose a lower financial burden on the Game Commission than ordinary property taxes, the express statutory requirement that it pay some form of property assessment to the Commonwealth strongly suggests that the General Assembly did not "regard[] the Commission as the Commonwealth itself." *Darby*, 94 F. Supp. at 537. So, this subfactor also points toward a determination that the Game Commission is not an arm of the state.

\* \* \*

Our analysis of the second predominant consideration involves countervailing considerations. On the one hand, the Game Commission's entitlement to sovereign immunity in

26

several Pennsylvania courts and its lack of a separate corporate existence somewhat favor the conclusion that the entity is an arm of the state. On the other hand, the Game Commission's "traditional corporate powers," *Galette*, 607 U.S. at 524, including its ability to sue and be sued, and its express lack of complete immunity from state taxation strongly suggest it is an independent citizen of the Commonwealth. On balance, the moderate leaning of the first subfactor and conclusive nature of the third and fourth subfactors, contrasted with the second, which we know is "not dispositive," *id.* at 530, weigh against the conclusion that the Game Commission is an arm of Pennsylvania.

### c. *Galette*'s Subordinate Consideration: Degree of State Control Over the Entity

While our arm-of-the-state analysis focuses "predominantly" on "whether the State structured the entity as a legally separate entity liable for its own judgments," *Galette*, 607 U.S. at 523-24, we may also, cautiously and to a lesser extent, consider what was formerly the third *Fitchik* factor: "the degree of control the State exerts over the entity," *id.* at 526. Here, the Game Commission's autonomy from "oversight and control exerted by a State's governor and legislature," *Maliandi*, 845 F.3d at 96, does not "meaningfully affect" its status or "change the overall conclusion" because it also points towards independence, *Galette*, 607 U.S. at 530.

The Game Commission is defined as an independent agency "not subject to the policy supervision and control of the

Governor." 2 Pa. Cons. Stat. § 101; *cf. Galette*, 607 U.S. at 530 (observing that NJ Transit is statutorily "independent of any supervision or control" of the transportation department, but its actions are subject to a gubernatorial veto). Although all nine of its members are appointed by the Governor, with the advice and consent of the Senate, and must meet certain statutory qualifications, the Director of the Commission is selected by and serves "at the pleasure of" its members. 34 Pa. Cons. Stat. §§ 301, 302(a); *see also Galette*, 607 U.S. at 530 (noting that the Governor can appoint and remove NJ Transit's board members); 74 Pa. Cons. Stat. § 8105(b), (e) (stating that the Turnpike Commission's members are appointed by the Governor, with the advice and consent of the Senate, but its Chairman is elected by the members).

The Game Commission also has "the power and duty to take all actions necessary for the administration and enforcement of this title," 34 Pa. Cons. Stat. § 322(b), including the power to "enact and enforce regulations," *id.* § 322(c)(10); *see also Galette*, 607 U.S. at 516 (stating that NJ Transit can "adopt rules and regulations as necessary"); 74 Pa. Cons. Stat. § 8107(a)(5) (authorizing the Turnpike Commission to enact "rules and regulations for its own governance"). And the Director exercises "sole control" over the administration of Game Commission property, with no obligation to obtain prior approval from the Governor or legislature. 34 Pa. Cons. Stat. § 721(a); *see* 74 Pa. Cons. Stat. § 8105(f) (explaining that actions by the Turnpike Commission are taken "solely" upon approval of its members).

28

What oversight the Governor and General Assembly exercise is largely constrained to the Game Commission's financial matters. For example, the Game Commission must submit legislative performance audits every three years, submit an annual report on its budget to a legislative committee, and obtain approval from the Governor of its estimated expenditures from the Game Fund before those funds are paid out. *See* 34 Pa. Cons. Stat. § 522(b)-(c); *see also* 74 Pa. Cons. Stat. §§ 8121, 8204 (requiring the Turnpike Commission to submit annual revenue reports to the General Assembly and to undergo performance audits). Such financial oversight does not negate financial independence. *See supra* Section III.A.2.a.i.

Moreover, unlike the Turnpike Commission, the Game Commission is not required to adhere to a legislatively devised code of conduct, *see* 74 Pa. Cons. Stat. § 8204(a), or to provide a supervisory executive department with an opportunity to review and approve its contracts or agreements prior to execution, *see id.* § 8120(b). Instead, it may enact and administer its own regulations, execute contracts and leases, acquire and develop its property, and issue licenses with a high degree of autonomy. Although the Commonwealth Attorneys Act authorizes the Attorney General to "review for form and legality" all the Game Commission's contracts, that review is limited to determining whether the contract is in improper form, not statutorily authorized, or unconstitutional. 71 P.S. § 732-204(f). And the Game Commission is free to disagree

29

with the Attorney General and appeal his determination to the Commonwealth Court. *Id.*

Thus, the autonomy of the Game Commission, though minimally probative, weighs in favor of independence.

\* \* \*

Under our updated arm-of-the-state test, the Game Commission is not an arm of Pennsylvania because Pennsylvania law "structured [it] as a legally separate entity liable for its own judgments," and its degree of autonomy only further supports that conclusion. *Galette*, 607 U.S. at 524. Although the Game Commission is entitled to sovereign immunity in Pennsylvania courts, is not formally incorporated, and lacks express liability for its own judgments, its legal and financial independence demonstrates that it is properly understood as a citizen of Pennsylvania for purposes of diversity jurisdiction. And as the Trust and the Game Commission are "citizens of different States," the District Court properly exercised diversity jurisdiction under 28 U.S.C. § 1332. We therefore proceed to the merits of the appeal.

## B. Ownership of the Josiah Haines Warrant

The Pennsylvania Supreme Court granted our petition for certification and answered the certified question of state law— i.e., whether the 1908 tax sale divested the Trust of its interest in the subsurface estate—in the negative, *see Pa. Game Comm'n v. Thomas E. Proctor Heirs Tr.*, 335 A.3d 1108

30

(Pa. 2025), and its central holdings govern our resolution of this interlocutory appeal, *see Bohus v. Restaurant.com, Inc.*, 784 F.3d 918, 925 (3d Cir. 2015).[11]

The Pennsylvania Supreme Court determined that "the 1908 tax sale did not constitute a title wash but, rather, acted as a mere redemption of taxes owed and, as such, did not divest the subsurface owners of their interest in the [Josiah] Haines Warrant." *Pa. Game Comm'n*, 335 A.3d at 1110.[12] The Court began its analysis by explaining the process of title washing under Pennsylvania law, "whereby the sale of unseated land at a tax sale extinguished all prior titles in the property and granted the tax sale purchaser exclusive title" to both the surface and subsurface estates. *Id.* at 1117; *see id.* at 1117-18 (citing *Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 368 (Pa. 2016)). While the holder of a defective title could generally purchase a better title at a tax sale, there is a narrow exception for a tax sale caused by the purchaser's own failure to pay taxes. *Id.* at 1118 (citing *Powell v. Lantzy*, 34 A. 450, 451 (Pa. 1896)). The rule in that circumstance, known as the *Powell* rule, is that "one cannot, by a purchase at a tax sale caused by his failure to pay taxes . . . , acquire a better title, or

---

[11] We express our appreciation to the Pennsylvania Supreme Court for granting our petition.

[12] When considering the certified question of state law, the Pennsylvania Supreme Court properly accepted as true the District Court's factual findings, as well as its determination that McCauley was acting as CPLC's agent. *See Pa. Game Comm'n*, 335 A.3d at 1112 n.4, 1113 n.8.

31

a title adverse to that of other parties in interest." *Powell*, 34 A. at 451.

To determine whether McCauley's purchase triggered that narrow exception, the Court had to answer a novel question: "whether owners of unseated land had a legal duty to the state to pay the taxes assessed on their land." *Pa. Game Comm'n*, 335 A.3d at 1118. *Powell* held only that owners of unseated land had no obligation to pay taxes assessed prior to their ownership; it did not decide whether owners of unseated land generally owed a duty to pay assessed taxes. The Court then reviewed its caselaw that could "be read as holding such a duty both did and did not exist," and harmonized those cases by "distinguish[ing] between landowners' duty and their potential liability for failing to perform that duty." *Id.* at 1120-21. It held that owners of unseated land owed a duty to the state to pay taxes levied on their land but were not liable for those taxes, such that the landowners "could not be personally compelled to make satisfaction for the taxes." *Id.* at 1122. Instead, the land itself could be held liable through a tax sale.

Finally, the Court applied its legal conclusions to the facts of this case and determined that CPLC owed a duty to the Commonwealth to pay taxes on the Josiah Haines warrant but failed to do so in 1907. Therefore, the *Powell* Rule applied and "the existence of that duty resulted in McCauley," as CPLC's agent, "being barred from purchasing the entirety of the [Josiah] Haines Warrant at the 1908 tax sale." *Id.* at 1123. Instead, McCauley's purchase "operated merely as a payment

32

of the taxes owed by CPLC, resulting in a redemption of CPLC's pre-existing title in the warrant's surface rights" and leaving intact the Trust's interest in the subsurface estate. *Id.*

The Pennsylvania Supreme Court's opinion "on matters of Pennsylvania state law constitutes precedent that we are bound to follow," so we will answer the question certified for our interlocutory review in accord with the Court's holding. *Wirth*, 469 F.3d at 311. On this record, the 1908 tax sale of the Josiah Haines warrant—to McCauley, CPLC's agent, and induced by the failure of CPLC, the surface estate owner, to pay taxes on the unseated land—did not constitute a title wash and, therefore, did not divest the Trust of its interest in the subsurface estate.[13]

---

[13] We recognize the potentially significant consequences of the outcome of this bellwether case, as raised by *amici curiae*, as well as the distinctly local quality of the issues before us, and we certified the controlling question of state law to the Pennsylvania Supreme Court for those reasons. Given the diverse citizenship of the parties and our "virtually unflagging obligation to hear and decide cases within [our] limited jurisdiction," *Borowski v. Kean Univ.*, 68 F.4th 844, 850 (3d Cir. 2023) (citation modified), we merely apply the Pennsylvania Supreme Court's precedential guidance to the dispute that the Game Commission chose to litigate in federal court.

## IV.  CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment in favor of the Trust on the issue of subsurface ownership of the Josiah Haines warrant, and we will remand for further proceedings consistent with this opinion.

*Counsel for Appellant*
Bradley C. Bechtel
William C. Martson
PENNSYLVANIA GAME COMMISSION

Michael J. Scarinci                    **[Argued]**
OFFICE OF ATTORNEY GENERAL OF PENNSYLVANIA

*Counsel for Amici Curiae EQT AMD LLC and EQT ARO LLC in Support of Appellant*
Richard L. Armezzani
Daniel T. Brier
John B. Dempsey                    **[Argued]**
MYERS BRIER & KELLY

Daniel T. Donovan
Gabrielle Durling
Aaron L. Nielson
KIRKLAND & ELLIS

*Counsel for Amicus Curiae International Development Corp in Support of Appellant*
Robert J. Burnett
HOUSTON HARBAUGH

*Counsel for Amicus Curiae Pennsylvania Department of Conservation and Natural Resources in Support of Appellant*
Curtis C. Sullivan
PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION

*Counsel for Appellee*
Christopher R. Healy
Justin G. Weber
TROUTMAN PEPPER LOCKE

Laura A. Lange                    **[Argued]**